J-S17030-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| E.S.K., | IN THE SUPERIOR COURT OF |
| :--- | :---: |
| Appellant | PENNSYLVANIA |
| v. | |
| J.L.K., | |
| Appellee | No. 1473 WDA 2015 |

Appeal from the Order August 28, 2015
In the Court of Common Pleas of Cambria County
Civil Division at No(s): 2011-1320

BEFORE:  GANTMAN, P.J., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 15, 2016**

Appellant, E.S.K. ("Father"), appeals from the August 28, 2015 order

that awarded shared legal custody of children E.T.K. and K.A.K. (collectively,

"the Children") to Father and Appellee, J.L.K. ("Mother").  The order also

awarded primary physical custody of the Children to Mother and partial

physical custody to Father.  We affirm.

In its Pa.R.A.P. 1925(a) opinion entered on October 23, 2015, the trial

court set forth the factual background and procedural history of this

contentious matter as follows:

> [Father and Mother] have two minor children, namely,
> E.T.K. [born in 2008] . . . and K.A.K. [born in 2010] . . . . Father
> filed a Complaint in Custody on April 8, 2011. The parties

---

[*]  Former Justice specially assigned to the Superior Court.

followed various interim consent orders from 2011 through 2014. On December 18, 2014, Mother filed a Petition for Modification.[1] Father filed an Answer and Counterclaim on March 16, 2015.[2] The trial court conducted Hearings on April 30, 2015; July 2, 2015; and July 17, 2015; and entered a Custody Order on August 28, 2015.

> [1] Mother filed a "Complaint in Custody," which the trial court construed as a Petition for Modification.

> [2] On April 13, 2015, Father filed an amendment to the Answer and Counterclaim, expanding his proposed shared custody schedule.

Father filed a Notice of Appeal and Concise Statement of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) on September 23, 2015. The four hearing transcripts[3] were lodged on October 5, 2015; October 7, 2015 (2); and October 13, 2015.

> [3] There are two transcripts for the Hearing conducted on July 17, 2015.

In its August 28, 2015 Opinion, the trial court made the following Findings of Fact:[4]

> [4] The trial court reproduces its Findings of Fact here in full, with citations to the record and redaction of the children's names.

> 1. The parties were married on December 18, 2007 and separated in March of 2011. HEARING NOTES OF TRANSCRIPT "N.T." (Apr. 30, 2015), pgs. 33, 58.

> 2. The parties are subject to an Interim Consent Order dated May 20, 2011. INTERIM CONSENT ORDER FILED FOR RECORD ON MAY 23, 2011. Pursuant to the Order, the parties shared legal custody and Mother exercised primary physical custody. *Id*. at ¶¶ 1, 4. Father had partial physical custody on Monday and Tuesday overnights; Friday

- 2 -

overnight on the third weekend of the month; and Friday through Sunday on the first, second, and fourth weekends of the month. *Id*. at ¶¶ 1 -2.

3. The parties informally modified the Interim Consent Order shortly after it was entered. N.T. (Apr. 30, 2015), pg. 61. Since that time, the parties share custody as follows: Mother has custody on Sunday, Tuesday, and Thursday overnights; Father has custody on Monday and Wednesday overnights; and the parties alternate weekends. N.T. (Apr. 30, 2015), pgs. 4, 15, 61. The party relinquishing custody provides transportation. N.T. (Apr. 30, 2015), pgs. 13-14, 61-62.

4. The parties resided in the Richland School District during the marriage. N.T. (Apr. 30, 2015), pgs. 55-56, 67.

5. Mother now resides in East Conemaugh Borough, Cambria County, in the Conemaugh Valley School District. N.T. (Apr. 30, 2015), pg. 3. Mother lives with the [C]hildren; her father, Thomas Marshall "Maternal Grandfather"; and two brothers, ages 25 and 27. N.T. (Apr. 30, 2015), Pg. 3.

6. Father resides in the Richland suburb of Johnstown. N.T. (Apr. 30, 2015), pg. 57.[5]

> [5] The trial court takes judicial notice [of] Father's address . . . . N.T. (Apr. 30, 2015), pg. 57.

7. K.A.K. will attend full-day kindergarten at Conemaugh Valley for the 2015-2016 school year; E.T.K. will attend second grade. N.T. (Apr. 30, 2015), pgs. 15, 24.

8. Mother has been employed as a Registered Nurse at Memorial Medical Center for five years. N.T. (Apr. 30, 2015), pg. 4. She writes her own schedule and works three days per week, mostly daylight shift. N.T. (Apr. 30, 2015), pgs. 5, 25.

9. Father has a degree in economics and finance from St. Francis University. N.T. (Apr. 30, 2015), pg. 58. He is a self-employed financial advisor for Ameriprise. N.T. (Apr. 30, 2015), pg. 65. Father testified that he "shuts the office down" on Mondays, Wednesdays and Friday afternoons to facilitate his periods of custody. N.T. (Apr. 30, 2015), pgs. 63-66.

10. Mother testified extensively about Father's spiteful and passive-aggressive behavior. *See e.g.*, N.T. (Jul. 17, 2015, second session), pgs. 24-31. Mother's testimony was credible and compelling. She requests primary physical custody of the children. N.T. (Apr. 30, 2015), pgs. 31-33.

11. Father alleges that the effects on his children of him "being relegated to an every-other-weekend dad would be catastrophic." N.T. (Apr. 30, 2015), pg. 88. Father requests equal shared custody. N.T. (Apr. 30, 2015), pgs. 88-89.

12. Father wants the children to attend the "superior Richland School District." N.T. (Apr. 30, 2015), pgs. 67, 93; N.T. (Jul. 17, 2015, second session), pg. 4. He acknowledges that he did not contest Mother enrolling E.T.K. in the Conemaugh Valley School District. N.T. (Apr. 30, 2015), pg. 93.

13. Rebecca Castiglione, Principal at Conemaugh Valley Elementary School, testified on behalf of Mother. N.T. (Apr. 30, 2015), pg. 95.

> a. At the end of the 2013-2014 school year, Ms. Castiglione attended a meeting with Father, E.T.K., and the guidance counselor. At the time, Ms. Castiglione was a Title I Reading Specialist. She testified that Father was confrontational and that he blamed Mother for some of the child's problems. Ms. Castiglione noted that Father made these comments in front of the minor child. N.T. (Apr. 30, 2015), pgs. 95-96.

b. For the 2014-2015 school year, Father was late retrieving E.T.K. from school on five occasions. Representatives of the school contacted Father and asked for the courtesy of a phone call when he was running late, but Father only called on one of the remaining four occasions. MOTHER'S Ex. 1. N.T. (Apr. 30, 2015), pgs. 96-97.

c. Father and his attorney advised Ms. Castiglione that Father was "technically [her] boss" and that she would have to follow Father's policies. N.T. (Apr. 30, 2015), pgs. 97 -99.

d. Ms. Castiglione testified that Father is "condescending" and "very difficult to work with" when she attempts to address issues with him. Ms. Castiglione prefers to communicate with Father in writing. N.T. (Apr. 30, 2015), pg. 98.

14. Christine Miller, secretary at Conemaugh Valley School District, testified on behalf of Mother. N.T. (Apr. 30, 2015), pg. 103. On several occasions when Father was picking up E.T.K. from school, Ms. Miller observed K.A.K. in Father's vehicle without a car seat. N.T. (Apr. 30, 2015), pg. 103. Ms. Miller witnessed this recur for several weeks before she called Cambria County Children and Youth Services. N.T. (Apr. 30, 2015), pgs. 103-104. Ms. Miller also noted that Father left K.A.K. in the vehicle unattended on one occasion. N.T. (Apr. 30, 2015), pgs. 103-104. Ms. Miller is acquainted with Maternal Grandfather and was aware of the parties' custody dispute. N.T. (Apr. 30, 2015), pg. 109.

15. Maternal Grandfather testified as follows.

a. Maternal Grandfather describes Father as "viciously abusive and disgustingly obsessive." N.T. (Jul. 2, 2015), pg. 5.

b. Father "despises" Mother and "hates" Maternal Grandmother.[6] N.T. (Jul. 2, 2015), pg. 11.

> [6] The trial court's original Findings of Fact incorrectly noted that Father hates Maternal Grandfather. *But see* N.T. (Jul. 2, 2015), pg. 11.

c. Father constantly accuses Mother of drinking alcohol and sleeping with other men in front of the children. N.T. (Jul. 2, 2015), pg. 5.

d. "Everything that came out of Father's mouth was a lie or an illusion." N.T. (Jul. 2, 2015), pg. 6.

e. Father uses foul language and often refers to Mother as a "whore, slut, lowlife, dirtball, or Conemaugh Valley dirtball." N.T. (Jul. 2, 2015), pg. 6.

f. Father "seems to be an expert at trying to get your dander up." N.T. (Jul. 2, 2015), pg. 7.

g. Father refused to take E.T.K. to football practice during his periods of custody, so the child's playing time was limited during games. Maternal Grandfather reports that E.T.K. played fewer quarters than less talented children for this reason. When Maternal Grandfather questioned Father about football practices, Father claimed he "had family events planned." N.T. (Jul. 2, 2015), pgs. 10-11.

h. When Father argued about transportation for custody exchanges, Father told Maternal Grandfather,

"Everyone knows that judge is a bitch. We'll do what we want." N.T. (Jul. 2, 2015), pg. 13.

i. Maternal Grandfather reports that the children often returned from Father's home "dirty." The problem was alleviated to some extent as E.T.K. became more self- sufficient. N.T. (Jul. 2, 2015), pg. 14.

j. For four years, Maternal Grandfather provided transportation for Sunday custody exchanges. N.T. (Jul. 2, 2015), pgs. 15-16. He also assists Mother by transporting the children to activities, especially E.T.K.'s sporting events. N.T. (Jul. 2, 2015), pgs. 5, 8. When E.T.K. played in two baseball leagues (one chosen by Mother and one chosen by Father), Maternal Grandfather ensured that the child attended nearly all practices and games in both leagues. N.T. (Jul. 2, 2015), pgs. 7-9, 17.

16. James Edward Ardary testified on behalf on Mother. He is a Corporal with the Stonycreek Township Police Department. N.T. (Jul. 2, 2015), pgs. 23-24. He dated Mother beginning in October of 2013. N.T. (Jul. 2, 2015), pgs. 24, 27. Mr. Ardary accompanied Mother to six or seven custody exchanges. N.T. (Jul. 2, 2015), pg. 28. On a few occasions, Mr. Ardary wore his police uniform and carried a firearm at the request of Mother's attorney. N.T. (Jul. 2, 2015), pgs. 28-29.

17. Mr. Ardary testified as follows:

a. When Mr. Ardary introduced himself to Father for the first time, Father replied, "I hear nice things about you, but your father is a real sh** bag." Father also told Mr. Ardary, "You better not hurt my kids." N.T. (Jul. 2, 2015), pg. 24.

b. During the third custody exchange, Father called Mr. Ardary "white trash" and said, "You better not be having S-E-X in front of my kids. I own you. My attorney owns you." N.T. (Jul. 2, 2015), pg. 25.

c. Mr. Ardary stopped accompanying Mother to custody exchanges in April of 2014 when Father contacted Ardary's supervisor, who recommended against further involvement. N.T. (Jul. 2, 2015), pgs. 29-30.

d. Father often videotaped custody exchanges. N.T. (Jul. 2, 2015), pg. 30.

e. Father occasionally videotaped Mother and Mr. Ardary at E.T.K.'s sporting events. Father also made statements such as, "There's that cop causing trouble again" or "You're white trash and you deserve each other." N.T. (Jul. 2, 2015), pg. 26.

f. Mr. Ardary described Father as "a type of a bully trying to egg you on." N.T. (Jul. 2, 2015), pg. 26.

18. E.T.K. currently plays football and baseball at Conemaugh Valley. N.T. (Apr. 30, 2015), pg. 18. Last fall (2014), Father refused to transport E.T.K. to football practices during his periods of custody. N.T. (Jul. 17, 2015, first session), pg. 18. Father testified that E.T.K. "just didn't want to play football anymore" and that he (Father) is "going to do whatever I can to make my kids happy." N.T. (Jul. 17, 2015, first session), pg. 18. Mother subsequently refused to take the child to the baseball league Father chose. N.T. (Jul. 17, 2015, second session), pgs. 5-6, 8.

19. Father claims there is "a definite bias" against him at Conemaugh Valley because Maternal Grandfather is a teacher and the head football coach, and Ms. Castiglione is the head cheerleading coach. N.T. (Apr. 30, 2015), pg. 72; N.T. (JUL. 17, 2015, first session), pg. 13. Father called Ms. Castiglione a "liar." N.T. (Jul. 17, 2015, first session), pg. L0. Father threatened Mother that she would face "the same politics in Windber," where his friends hold positions of influence. N.T. (Jul. 17, 2015, first session), pgs. 10-11; N.T. (Jul. 17, 20 t 5, second session), pg. 16.

20. Father's insincere and passive-aggressive behavior is displayed in his frequent emails to Mother, which contain seemingly cooperative statements juxtaposed with hurtful and derogatory accusations. N.T. (Jul. 2, 2015), pgs. 44-45. For example:

> a. May 24, 2015 email: Thank you for picking up lil E.T.K. and K.A.K. today on this Memorial Day weekend. My father was here and the exchange that [sic] went nice and smooth here in Richland and see [sic] no reason it has to change. *While your dad has always picked up the kids on Sunday's [sic] for approx. 4 years I heard and remember him being not unable [sic] to drive out of CV due to CV drinking events on memorial day [sic] weekends in the past (your mother each other and now). The kids do not need to see your father drunk .... More important is that you [sic] parents didn't kill anyone because of drinking and driving like your grandfather Wolfe did on the poor kid riding his bike by the beer store a block away from your home ....* MOTHER'S Ex. 2 (JUL. 2, 2015) (*emphasis added*).

> b. May 30, 2015 email (8:02 P.M.): *Since you are out as usual* I ask that you bring

E.T.K. and K.A.K. to me tomorrow to go with their teams to the Altoona Curve game? [sic] .... *Don't say you have plans with the kids because if you did you would include them in your happy hour tonight*. Have a good night. Be safe. MOTHER'S Ex. 2 (JUL. 2, 2015) (*emphasis added*).

c. May 30, 2015 email (8:14 P.M.): You are not wit [sic] E.T.K. and K.A.K. now and *the promiscuous behavior you have chosen is not my business anymore or my care*. I simply ask that you work with me on letting the kids be active in their Richland t-ball/baseball trip .... MOTHER'S Ex. 2 (JUL. 2, 2015) (*emphasis added*).

d. June 27, 2015 email: We need the birth certificates back or at least certified copies that you took when you were given free run to collect your things at the home office .... I will pick up the slack if I have to do without to see that they get a life out of CV *especially since you and your family can not sit home sober on a Saturday night* .... MOTHER'S Ex. 2 (Jut.. 2, 2015) (*emphasis added*).

e. July 7, 2015 email: I would like you to extend the same courtesy to me that I gave to you when I took E.T.K. and K.A.K. to Disney world [sic] .... The kids told me you are going to the beach. Please provide me the information. Also please give your grandmother [sic] Marshall my regards. *The kids told me she has been in the hospital and prior to our marriage she was always very nice and honest with me even telling me your whole family is bad with money. Then she got your Aunt Judy who has drug and alcohol problems to stop calling my*

*office for money.* If you would give me her room number I would like to send her flowers. Have a good day. MOTHER'S Ex. 2 (JUL. 17, 2015). N.T. (JUL. 17, 2015, first session), pg. 16.

f. July 9, 2015 email:.... No more email fighting. Contact info for kids please and be safe and have fun. *No intercourse in front of the kids please that [sic] is not proper.* MOTHER'S Ex. 1 (JUL. 17, 2015). N.T. (JUL. 17, 2015, first session), pg. 14.

g. July 20, 2015 email: I took K.A.K. to her 5 year wellness checkup last Wednesday 7-15-15 and she is fine. I'm taking lil E.T.K. to the dentist today to get a cavity filled and will pay cash again to see to it our children get the health and dental care they need. I'll provide you with copies of the bills you [sic] can choose to pay half. *I'm still shocked your sister had an abortion so this should be a wakeup call for both of us as to how lucky we are to have two healthy kids and that karma is real. We lit a candle at church today for baby. All the times I heard your mom speak of abortion I'm sincerely sorry for your loss. No parent should have to bury their children once it is born and developed especially. Kids are what it's all about and why I started the anti-bully movement in our county with the help of others.* MOTHER'S EX. 2 (JUL. 2, 2015) (*emphasis added*).

21. Father portrays himself as a God-fearing, attentive parent who wants only the best for his children. *See* N.T. (JUL. 17, 2015, first session), pgs. 13, 21-24; N.T. (JUL. 17, 2015, second session), pgs. 9-12. In reality, Father is judgmental, verbally abusive, and insincere. *See* N.T. (Jul. 17, 2015, second session), pgs. 9-12.

- 11 -

22. When Mother suffered a miscarriage, Father told Maternal Grandfather, "Congratulations on the grandchild you almost had." N.T. (Jul. 17, 2015, first session), pgs. 24-25.

23. Mother occasionally succumbs to Father's goading, such as when she punched him at the gym or when she lashes out in emails. *See, e.g.*, FATHER'S Ex. 6 AND 7 (Jul. 17, 2015). N.T. (Apr. 30, 2015), pgs. 10-12; N.T. (Jul. 17, 2015, second session), pgs. 24-25. Mother, however, recognized that she was not dealing appropriately with Father after the gym incident, and she sought counseling. N.T. (Apr. 30, 2015), pgs. 12-13. Although Mother's behavior has been far from perfect, she demonstrates significant insight into the situation and exhibits a sincere willingness to address the parties' communication issues. N.T. (Jul. 17, 2015, second session), pgs. 24-25.

24. On rebuttal, Eric Danchanko testified on behalf of Father. Mr. Danchanko has known Father since they played high school football, and they became reacquainted in 2002-2003 at the YMCA while lifting weights. N.T. (Jul. 17, 2015, second session), pg. 21. Mr. Danchanko describes Father as "overly caring for his children... almost to the point of being overly nice to them. You can see that he genuinely loves them." N.T. (Jul. 17, 2015, second session), pg. 22.

OPINION DATED AUGUST 28, 2015, FINDINGS OF FACT ¶¶ 1-24.

Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 1-7. On August 28, 2015, the trial court awarded shared legal custody of the Children to Mother and Father, primary physical custody to Mother, and partial physical custody to Father. The order established a schedule for Father to exercise his periods of physical custody.

On September 23, 2015, Father timely filed a notice of appeal and concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(a) and (b).  In his brief on appeal, Father raises the following issues:

1. Did the trial court err in failing to develop a complete record by failing to take testimony from the adult members of Mother's household including her mother and her brothers?

2. Did the trial court abuse its discretion in modifying Father's periods of custody without directly assessing the benefits of stability in custody arrangements and the potential harm to the children from disruption of their longstanding patterns of care?

3. Did the trial court abuse its discretion in making the following unreasonable conclusions?

a. Father is dangerously insincere which adversely affects the children's best interests;

b. Father is unable to isolate his feelings toward Mother when he is with the children and is indoctrinating the children with his jaded beliefs;

c. Father is passive aggressive and dangerous to the minor children in that he is a "wolf in sheep's clothing" whose primary goal is to indoctrinate the children with his hateful opinions about Mother; and,

d. Father is inattentive to the children's physical needs.

Father's Brief at 18.

The custody trial in this matter was held in April and July of 2015. Accordingly, the Child Custody Act (the "Act"), 23 Pa.C.S. §§ 5321-5340, is applicable.  *C.R.F. v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012) (holding

that, if the custody proceeding commences on or after January 25, 2011, the

effective date of the Act, the provisions of the Act apply).

In custody cases, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F.*, 45 A.3d at 443 (citation omitted). Furthermore, this Court has

stated:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting

*Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In *M.A.T. v. G.S.T.*, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we

stated the following regarding an abuse of discretion standard:

> Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error

of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*Id*. at 18-19 (quotation and citations omitted).

Section 5323 of the Act provides for the following types of custodial awards:

**(a) Types of award.—**After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S. § 5323. Additionally, section 5323(d) of the Act provides that the trial court shall set forth the reasons for its decision on the record in open court or in a written opinion or order.

Section 5322 of the Act defines the relevant forms of custody as follows:

**§ 5322. Definitions**

- 15 -

**(a) This chapter.—** The following words and phrases when used in this chapter shall have the meanings given to them in this subsection unless the context clearly indicates otherwise:

* * *

**"Legal custody."** The right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions.

* * *

**"Partial physical custody."** The right to assume physical custody of the child for less than a majority of the time.

**"Physical custody."** The actual physical possession and control of a child.

**"Primary physical custody."** The right to assume physical custody of the child for the majority of time.

* * *

**"Shared legal custody."** The right of more than one individual to legal custody of the child.

**"Shared physical custody."** The right of more than one individual to assume physical custody of the child, each having significant periods of physical custodial time with the child.

**"Sole legal custody."** The right of one individual to exclusive legal custody of the child.

**"Sole physical custody."** The right of one individual to exclusive physical custody of the child.

* * *

23 Pa.C.S. § 5322(a).

Section 5328(a) of the Act provides a non-exhaustive list of factors for the trial court to consider when awarding custody:

## § 5328.  Factors to consider when awarding custody

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.[1]

With any custody case decided under the Act, the paramount concern is the best interests of the children involved. 23 Pa.C.S. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the children. Section

_____

[1] Effective January 1, 2014, the statute was amended to include an additional factor at 23 Pa.C.S. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services). Although applicable at the time of the custody hearings in this matter, there was no evidence that would have required the trial court's consideration of this factor.

5328(a) of the Act sets forth the best interest factors that the trial court must consider. *E.D. v. M.P.*, 33 A.3d 73, 80-81, n.2 (Pa. Super. 2011).

In *A.V. v. S.T.*, 87 A.3d 818 (Pa. Super. 2014), this Court explained the following:

> "*All* of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). . . . The record must be clear on appeal that the trial court considered all the factors. *Id*.
>
> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record or in open court or in a written opinion or order." 23 Pa.C.S.A. 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen Section 5328 custody factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.*, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 620 Pa. 727, 70 A.3d 808 (2013). Section 5323(d) applies to cases involving custody and relocation. *A.M.S. v. M.R.C.*, 70 A.3d 830, 835 (Pa. Super. 2013).
>
> In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id*.

*Id*. at 822-823 (emphasis in original).

In his first issue, Father asserts that the trial court is responsible for developing a complete record in a contested custody case, notwithstanding the enactment of the Act. Father's Brief at 32-38. However, while Father sets forth applicable case law, he provides no argument on this issue

relevant to the case at bar. Rather, Father's brief provides a statement of the law and an accusation that the trial court failed to develop a complete record. *Id*. Specifically, Father avers that maternal grandmother and Mother's brothers should have testified. *Id*. at 32. Yet, Father fails to delineate their testimony, its value, or what would have been accomplished by the trial court compelling the testimony from additional members of Mother's family. Father's argument is completely undeveloped. Accordingly, we conclude that this issue is waived. *See Harris v. Toys "R" Us–Penn, Inc.*, 880 A.2d 1270, 1279 (Pa. Super. 2005) (stating that an appellant's failure to develop an argument with analysis of relevant authority waives that issue on review).

Were we to consider this issue, we would agree with the trial court's analysis. The trial court addressed Father's claim of error as follows:

> In the case at bar, the trial court outlined the order of witnesses for the first day of trial in its initial scheduling order:
>
> > The moving party (Mother) shall testify first; the responding party (Father) shall testify next. After both parties provide direct and cross examination, each party shall be given an opportunity to present the balance of his or her case-in-chief. In order to ensure that the Court receives approximately equal information from both parties during the Hearing, each party shall be afforded 1¼ hours for the presentation of his or her case, including direct and cross examination. *Both parties are directed to present witnesses in descending order of significance when possible.* If additional time is needed, the hearing will be rescheduled.

ORDER DATED DEC. 30, 2014, ¶ 2 (emphasis added).

On the third day of trial, Father presented two rebuttal witnesses, namely, himself and Eric Danchanko. *See* N.T. (Jul. 17, 2015, first session), pgs. 26 -29; N.T. (Jul. 17, 2015, second session), pgs. 4-24. Mr. Danchanko briefly testified about his relationship with Father, and he described Father's love and care for the children. OPINION DATED AUGUST 28, 2015, FINDINGS OF FACT ¶¶ 1-24 (referencing N.T. (Jul. 17, 2015, second session), pg. 22). The trial court considered this testimony to be general at best and concluded that Mr. Danchanko lacked any personal knowledge regarding pertinent issues, *e.g.* Father's treatment of Mother via email, Father's daily routine and care of the children, etc. At the conclusion of Mr. Danchanko's testimony, Father declined to present additional rebuttal testimony. N.T. (Jul. 17, 2015, second session), pg. 24. Mr. Danchanko was Father's only third-party witness.

Neither party tendered maternal grandmother or maternal uncle as a witness during the trial. The trial court entertained all evidence proffered by both parties. The court scheduled two additional days for trial when the originally-allotted time proved to be insufficient. *See* N.T. (Jul. 2, 2015); N.T. (Jul. 17, 2015). Father's only third-party witness was Mr. Danchanko, who provided limited relevant information. Pursuant to the court's directive to present witnesses in descending order of significance, any other witnesses offered by Father presumably would have provided less relevant information than Mr. Danchanko. For these reasons, the trial court avers that it did not fail to develop a complete record.

Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 10-11.

Thus, had this issue been properly presented, we would have determined that there was no abuse of discretion. The members of Mother's household had long been known to both parties, and there was no argument that the record needed further development with regard to maternal grandmother or brothers.

In his second argument, Father contends that the trial court failed to assess the benefits of stability in custody arrangements and that the

potential harm to the Children from the disruption of their longstanding patterns of care constitutes an abuse of discretion. This issue is meritless. The trial court did address stability, and Father is merely dissatisfied with the outcome. The trial court found Mother's testimony more credible, and it declared that the then-existing custody arrangement did not provide the stability Father claimed. Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 12.

As noted above, the trial court was required to consider the factors set forth in 23 Pa.C.S. § 5328(a), which include the Children's need for stability. 23 Pa.C.S. § 5328(a)(4). The trial court ruled on this issue as follows:

> [T]he trial court considered Mother's testimony regarding the children's need for a routine, including consistent bus routes, homework, baths, reading, and bed times. N.T. (Apr. 30, 2015), pg. 31. It also considered Mother's testimony regarding the practicality and socialization of the children participating in activities within their school district. N.T. (Apr. 30, 2015), pg. 32. *See also* N.T. (Jul. 17, 2015, second session), pgs. 35-36 (Mother explaining that E.T.K. would not continue to do well in school living in Father's "capricious lifestyle" because E.T.K.'s schoolwork will intensify). The trial court further considered Father's superficial reasons for enrolling E.T.K. in activities across school districts and pulling the children away from Conemaugh Valley. *See e.g.*, N.T. (Apr. 30, 2015), pg. 72; N.T. (Jul. 17, 2015, first session), pg. 13 (Father claims there is "a definite bias" against him at Conemaugh Valley). Furthermore, the parties have struggled in choosing and implementing a stable sports schedule for E.T.K. OPINION DATED AUGUST 28, 2015, FINDINGS OF FACT ¶¶ 15(g), 18. The trial court carefully considered the children's current schedules, each party's concerns, and the effect of the parties' strained communication on their current arrangement. *See id.*, DISCUSSION ¶ 4. *See also* ORDER DATED JUL. 17, 2015 (recommending that the parties engage in communications counseling). The trial court concluded that a more stable and routine schedule with activities in the children's home school district would be in the best

- 22 -

interests of the children. OPINION DATED AUGUST 28, 2015, DISCUSSION ¶ 4.

      Therefore, the trial court appropriately considered the need for stability and continuity in the children's education, family life, and community life. This court submits that it properly awarded Mother primary physical custody and Father partial physical custody on alternating weekends, Monday and Wednesday evenings, two uninterrupted weeks in the summer, and other times as mutually agreed by the parties. ORDER DATED AUG. 28, 2015, ¶¶ 2-3.

Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 12-13.

After review, it is evident that the trial court aptly considered the Children's need for stability under 23 Pa.C.S. § 5328(a)(4). We discern no abuse of discretion in the trial court's determination.

In his third argument, Father asserts that the trial court abused its discretion when it decided that he is dangerously insincere, indoctrinated the Children with hateful opinions about Mother, and was inattentive to the physical needs of the Children. We disagree.

While Father couches his argument in terms of the trial court's abuse of discretion, we conclude that Father is merely asking this Court to find his testimony more credible than Mother's testimony, which would usurp the trial court's fact-finding role. We decline this invitation as that is not the function of this Court on review in custody matters. **C.R.F.**, 45 A.3d at 443

As noted previously, the trial court discussed the credibility of the parties and the impact of their behavior on the Children. Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 3, 5 (quoting Opinion Dated August 28, 2015,

Findings of Fact ¶¶ 10 and 21). The trial court provided the following discussion on this issue:

> In this case, the trial court made multiple findings sufficiently supported by the record regarding Father's hostility towards Mother and the resulting effect on the children. OPINION DATED AUGUST 28, 2015, FINDINGS OF FACT ¶¶ 20-22; DISCUSSION ¶¶ 1-3, 8-10, 13. Additionally, the trial court specifically questioned Father regarding his behavior as follows:
>
>> THE COURT: Do you mind if I ask a question. Sir, so many of these emails, I mean, you come up on the stand and you portray yourself as a God-fearing, moral, admittedly prudish man who wants only the best for his children. On paper I am seeing a pattern here where you make comments that are really very bitter and nasty but appear to be polite, like what you said about "please give Grandmother Marshall my regards. The kids told me she has been in the hospital, and prior to our marriage she was always very nice and honest with me." Up until that point it sounds like you're being nice and kind, and then you say "even telling me your whole family is bad with money, then she got your Aunt Judy who has a drug and alcohol problem to stop calling my office for money." So you like to just give the digs, and you seem to be doing the same thing about Mother's family here. So I'm trying to reconcile the persona you want me to believe and the persona that shows up on paper and that third party witnesses testified to at court, and there doesn't seem to be any resemblance between the two. Can you help me understand that?
>>
>> FATHER: Yes. It is just as business. I am very aggressive in business when I'm at business at work or if I'm communicating. I would suggest that we do Family Wizard or counseling so I can improve upon my communication with Mother and not be so - take things so harshly or however they might read.

- 24 -

> THE COURT: So are you saying that anything connected with your family you deal with it like business and you're aggressive and this way?
>
> FATHER: Not with my family. But whenever I'm dealing with Mother, I'm trying to be professional, and I'm not perfect at it. I have a strong - I don't hate her. I have a strong dislike because I don't get to see my kids half the time now. So oftentimes emotion, which is the most powerful thing in the world, gets in the way a little bit, and that anger comes out and I admit it.

* * *

Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 14-15 (quoting N.T., 7/17/15, at 21-22) (internal footnote omitted). Ultimately,

> The trial court asked Father direct questions about his credibility (and received unsatisfactory answers), and it carefully observed Father's demeanor. . . . Based on Father's testimony and demeanor, Mother's testimony, and the testimony of multiple third parties, the trial court concluded that Father's insincere, jaded, and passive-aggressive behaviors adversely affected the best interests of the children. OPINION DATED AUGUST 28, 2015, DISCUSSION ¶¶ 1, 8-9.

Pa.R.A.P. 1925(a) Opinion, 10/23/15, at 17.

After a careful review of the record, we discern no error or abuse of discretion in the trial court's credibility determinations or its characterization of Father's demeanor and its impact on the best interests of the Children. Accordingly, we affirm the August 28, 2015 order.

Order affirmed.

- 25 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/15/2016